

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-22-00282-CV

———————————————

CSL S WEATHERFORD, LLC AND CAPITAL SENIOR MANAGEMENT S, INC., Appellants

V.

SHIRLEY JEAN ARENS, Appellee

On Appeal from the 415th District Court
Parker County, Texas
Trial Court No. CV21-1067

Before Kerr, Birdwell, and Walker, JJ.
Opinion by Justice Birdwell

**OPINION**

This is an interlocutory appeal challenging the trial court's denial of a motion to dismiss, with prejudice, the health care liability claims of Appellee Shirley Arens against Appellants CSL S Weatherford, LLC ("Weatherford") and Capital Senior Management S, Inc. d/b/a[1] Martin Crest ("Management") due to her alleged failure to serve them with an expert report as required by the Texas Medical Liability Act (TMLA). *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b); *see also id.* § 51.014(a)(9) (allowing interlocutory appeal for denial of motion under Section 74.351(b)).

Because (1) the TMLA authorizes service upon a "party or the party's attorney" even before the filing of a health care liability claim and (2) the record reflects Arens accomplished such pre-suit service upon Appellants through their attorney, we hold that the trial court did not abuse its discretion by denying the motion. Accordingly, we affirm.

---

[1]"D/b/a means 'doing business as.'" *Perkins v. Hicks*, No. 02-17-00227-CV, 2018 WL 3968489, at *4 (Tex. App.—Fort Worth Aug. 16, 2018, no pet.) (mem. op.). Use of the acronym "d/b/a" indicates that the person or business named immediately preceding conducts business under an assumed name. *See Fettner v. Daniel Jackson & Assocs., P.C.*, No. 14-19-00497-CV, 2021 WL 126396, at *2 & n.2 (Tex. App.— Houston [14th Dist.] Jan. 14, 2021, no pet.) (mem. op.). "An 'assumed name' is a word or phrase by which a person may be known to the public, and is not a legal entity." *Id.* at *2 (quoting *CA Partners v. Spears*, 274 S.W.3d 51, 69 n.11 (Tex. App.— Houston [14th Dist. 2008, pet. denied)). In effect, the acronym "d/b/a" identifies two or more names as synonyms, "each of which refers to the same person or business." *Id.*

# I. Background

## A. The First Lawsuit

On October 6, 2020, Arens filed suit against Capital Senior Living, Inc. d/b/a Martin Crest Assisted Living ("Living") and Mark Sanders, D.O., in the 43rd District Court of Parker County, asserting health care liability claims arising from her residency at the assisted living facility. By way of her petition, Arens alleged the negligence of the nursing staff at the facility proximately caused her physical injuries due to falls, poor nutrition and hydration, and the development of a Stage III bed sore. She specifically identified Becky Phillips as the facility director responsible for the poor care she received and alleged the facility was vicariously liable for the negligence of its nursing staff.

On November 25, 2020, Living filed its original answer, specifically denying that it was the proper party to be sued or that it did business as Martin Crest Assisted Living. By electronically signing the answer, Michael L. Hurst of the Thompson, Coe, Cousins & Irons, LLP firm appeared as the attorney of record for Living. Arens subsequently nonsuited her lawsuit on March 12, 2021, "for the sole purpose of getting the expert report."

## B. The Second Lawsuit and the Chapter 74 Expert Report

On August 17, 2021, Arens refiled her lawsuit in the 415th District Court of Parker County, naming Living as the sole defendant. Contemporaneously with the filing of her original petition, Arens filed a Chapter 74 expert report, *see id.* § 74.351,

authored by Donna S. Jones, R.N. The expert report addressed the standard of nursing care owed by "Martin Crest Assisted Living Facility" to Arens and named Becky Phillips and one of the facility's licensed vocational nurses, T. Tidwell, as responsible nursing care providers, but did not identify Living or any other entity as the owner or manager of the facility. Soon after filing, counsel for Arens received a "Notification of Service" from the electronic filing manager, which identified Hurst—by both name and the email address he employed in the first lawsuit—as a service contact for the expert report, although "not [one] associated with a party on the case." The electronic filing envelope further confirmed that Hurst opened the file at 9:02 a.m. the following day, August 18.

Shortly before filing the second lawsuit on August 17, counsel for Arens had emailed Hurst inquiring, "Will you be accepting service on Martin Crest in this case?" When Hurst did not immediately respond, counsel sent a second email on August 19 following up on the original. Finally, on August 25, Hurst responded affirmatively: "Sorry, I was out on vacation—back today. I can accept service if still an option. We can say service was today and the answer will be due on or before Monday, September 20. Does that work?" Counsel for Arens responded a few minutes later: "Yes, sir." The next day, another attorney representing Arens forwarded pdf versions of the original petition and the expert report to Hurst, copying Arens's lead counsel on the email: "That works. Attached is the Original Petition and Expert Report we filed. Answer date on or before September 20th. Thank you."

4

Consistent with this email agreement, Living filed its original answer in the second lawsuit on September 20, 2021,[2] and again specifically denied that it was the proper party to be sued or that it did business as Martin Crest Assisted Living. Hurst again signed the answer as the attorney of record for Living and, also under his signature, contemporaneously filed Living's initial disclosures, specifically denying Living did business as Martin Crest Assisted Living but identifying six different potential defendants—two of whom were Appellants Weatherford and Management.

Significantly, Exhibit A attached to these disclosures identified Appellants in the following manner as persons with knowledge of relevant facts:

**(8)      Employees, agents, and representatives of Capital Senior Management S, Inc. including Becky Phillips, Terrlynn Tidwell, LVN, Christine Lang, Laurie Mayberry, RN, and Jessica McDonald, RN**

---

[2]"It has long been the law in Texas that waiver of service of process may not be made prior to the initiation of the suit." *Gamboa v. Alecio*, 604 S.W.3d 513, 517 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (first citing *McAnelly v. Ward*, 12 S.W. 206, 206–07 (Tex. 1888); and then citing Tex. Civ. Prac. & Rem. Code Ann. § 30.001). Rule 119 requires the filing of a verified written memorandum by the defendant or by its duly authorized agent or attorney "after suit is brought" to effectuate the waiver and formally subject the defendant to the trial court's personal jurisdiction. Tex. R. Civ. P. 119. No such verified written memorandum appears in this record. *See Macs v. Lenahan*, No. 04-17-00033-CV, 2018 WL 280469, at *2–3 (Tex. App.—San Antonio Jan. 3, 2018, pet. denied) (mem. op.) (holding unsworn Rule 11 agreement between attorneys could not serve as valid Rule 119 waiver of citation); *Combustion Eng'g, Inc. v. Vukich*, No. 13-01-750-CV, 2002 WL 34231010, at *4 (Tex. App.—Corpus Christi–Edinburg Nov. 21, 2002, no pet.) (not designated for publication) (same).

Nevertheless, the subsequent filing of an answer on behalf of Living cured any defect in the email agreement reached between counsel. Tex. R. Civ. P. 121 ("An answer shall constitute an appearance of the defendant so as to dispense with the necessity for the issuance or service of citation upon him.").

c/o Michael L. Hurst
Thompson, Coe, Cousins & Irons
Plaza of the Americas
700 N. Pearl Street, 25th Floor
Dallas, Texas 75201
(214) 871-8200

*Manager of Martin Crest during Shirley Arens'[s] residency*

**(9)    CSL S Weatherford LLC**
c/o Michael L. Hurst
Thompson, Coe, Cousins & Irons
Plaza of the Americas
700 N. Pearl Street, 25th Floor
Dallas, Texas 75201
(214) 871-8200

*Owner of the facility during Shirley Arens['s] residency at Martin Crest*

So, in addition to identifying himself as the attorney of record for Living, Hurst further identified himself as the attorney through whom counsel for Arens could contact Appellants as owner and manager of Martin Crest Assisted Living, as well as those employees identified as knowledgeable of the nursing care provided to Arens at the facility, including Becky Phillips and Terrlynn Tidwell—both of whom were implicated by the expert report.[3]

---

[3]When asked to describe documents that may be used to support a claim or defense on the part of Living, the disclosures deny possession of any such documents as to Living but confirm that "records have been produced by a separate potential Defendant and bate-stamped [sic] ARENS 000001 through ARENS 000361." *See Texaco, Inc. v. Dominguez*, 812 S.W.2d 451, 457 (Tex. App.—San Antonio 1991, orig. proceeding) (describing Bates-stamping as a numbering system by which documents exchanged in anticipation of or during litigation facilitate discovery).

## C. Arens's First Amended Petition

On January 4, 2022, Arens filed her first amended petition, alleging the same health care liability claims, but adding Appellants Weatherford and Management (incorrectly named Capital Senior Management) as new defendants. Arens did not, however, file and serve an expert report contemporaneously with her amended pleading, as she had with her original petition.

Before filing the amended pleading, counsel for Arens had emailed Hurst inquiring whether he would be accepting service of process on behalf of the new defendants. Indeed, the amended petition stated, "it is anticipated that attorneys for Martin Crest will accept service on behalf of the defendants." Having not received a response, counsel for Arens followed up by email the next day. Hurst responded immediately, indicating that he had emailed a recommendation to "the people on my end" that he be authorized to accept service for the new defendants but had not yet heard back. Neither of these emails referenced any expert report as part of the service to be accepted. On January 8, Hurst emailed counsel for Arens confirming that he had been given "permission to accept service" for the new defendants but that Management had been misnamed. Consistent with this email agreement between

---

This confirmation of a pre-suit document exchange between Arens and a separate "potential Defendant" identified in the disclosures—which included Weatherford and Management whom Hurst specifically identified as the facility's owner and manager—reasonably suggests Hurst's participation in the exchange on the "potential Defendant['s]" behalf.

counsel, Appellants filed their original answer on January 31, 2022. Hurst signed the answer as Appellants' attorney of record.

## D. Appellants' Motion to Dismiss

On June 6, 2022, pursuant to Section 74.351(b), Hurst filed a motion to dismiss Arens's health care liability claims against Appellants asserting as grounds her failure to timely serve any expert report on Appellants and requesting reasonable attorney's fees and court costs. The motion conceded that Arens had timely served an expert report on Living but categorically denied that such service could be imputed to Appellants.

Arens responded that the expert report timely served on Living asserted negligence specifically against Martin Crest Assisted Living, the assisted living facility Living was alleged to be doing business as, and argued that service on Hurst—as counsel for "Martin Crest"—constituted service on counsel for Appellants, particularly since Hurst identified himself as retained to represent "ALL Defendants." After hearing the motion and considering testimony and documentary evidence, the trial court denied the motion in its entirety. Appellants now challenge that ruling in this interlocutory appeal.

## II. Discussion

### A. Standard of Review

To prosecute a health care liability claim, a claimant must comply with the expert report requirement of the TMLA. *Id.* § 74.351. Section 74.351(a) provides that,

8

as a prerequisite for filing and maintaining such a claim, "a claimant shall, not later than the 120th day after the date each defendant's original answer is filed . . . , serve on that party or the party's attorney one or more expert reports." *Id.* § 74.351(a). "Strict compliance with that provision is mandatory." *Zanchi v. Lane*, 408 S.W.3d 373, 376 (Tex. 2013). "If a claimant does not serve an expert report by the statutory deadline and the parties have not agreed to extend the deadline, the statute requires, with one exception not relevant here, dismissal of the claim with prejudice 'on the motion of the affected physician or health care provider.'" *Id.* (quoting Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b)).

A trial court's ruling on a motion to dismiss pursuant to Section 74.351(b) is subject to review for an abuse of discretion. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001); *Jackson v. Kindred Hosps. Ltd. P'ship*, 565 S.W.3d 75, 80 (Tex. App.—Fort Worth 2018, pet. denied). "Under an abuse of discretion standard, the appellate court defers to the trial court's factual determinations if they are supported by evidence, but reviews the trial court's legal determinations de novo." *Stockton v. Offenbach*, 336 S.W.3d 610, 615 (Tex. 2011). "A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles." *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003). In applying this standard, an appellate court may not substitute its own judgment for that of the trial court, or otherwise find an abuse of discretion merely because it would have ruled differently on the same. *See id.* To that end, if the

9

trial court did not file findings of fact or conclusions of law, the reviewing court may "uphold the trial court's ruling on any theory supported by the record and imply any findings of fact necessary to support its ruling." *Rinkle v. Graf*, 658 S.W.3d 821, 824 (Tex. App.—Houston [14th Dist.] 2022, no pet.).

## B. The Meaning of "the Party's Attorney" Under the TMLA

In *Zanchi*, the Supreme Court of Texas interpreted the TMLA's requirement of service of an expert report on a "party" to authorize such service upon a health care liability defendant not yet subject to the trial court's personal jurisdiction through service of process. 408 S.W.3d at 377–79. In so holding, the court expressly disapproved of the reasoning of this court and four of our sister courts of appeals interpreting the term "party" to mean "one who has been named in a[ health care liability claim] and served with citation and a copy of the petition, accepted or waived such service, or made an appearance."[4] *See id.* at 377–78. In particular, the court found persuasive that the TMLA expressly defined "defendant"—or the intended "party" to be served—to mean a "physician or health care provider against whom a health care liability claim is asserted" without regard to whether the physician or provider has been served with citation. *Id.* at 378 (quoting Tex. Civ. Prac. & Rem. Code Ann.

---

[4]*See, e.g.*, *Key v. Muse*, 352 S.W.3d 857, 860–64 (Tex. App.—Dallas 2011, no pet.); *Carroll v. Humsi*, 342 S.W.3d 693, 701 (Tex. App.—Austin 2011, no pet.); *Dingler v. Tucker*, 301 S.W.3d 761, 766–68 (Tex. App.—Fort Worth 2009, pets. denied); *Carreras v. Zamora*, 294 S.W.3d 348, 350 (Tex. App.—Corpus Christi–Edinburg 2009, no pet.); *Yilmaz v. McGregor*, 265 S.W.3d 631, 640 (Tex. App.—Houston [1st Dist.] 2008, pet. denied).

§ 74.351(r)(4)). Consistent with this reasoning, the court held that service of a report need not comply with the strict dictates of Rule 106 of the Texas Rules of Civil Procedure for service of citation but could be accomplished by one of the methods set forth by Rule 21a. *Id.* at 380–81. Accordingly, the court held that the expert report served upon the defendant anesthesiologist via certified mail before the claimant accomplished service of citation complied with Section 74.351(a). *See id.* at 379–81.

The supreme court subsequently clarified its interpretation of the term "party" in *Hebner v. Reddy*, to include a physician or health care provider served with an expert report "concurrently" with the pre-suit notice mandated by the TMLA, expressly rejecting the filing of a petition formally naming the recipient as a defendant as a necessary predicate for compliance. 498 S.W.3d 37, 41–43 (Tex. 2016). After serving an expert report concurrently with pre-suit notice of their claim approximately six months before filing suit, the claimants—parents of a baby girl who tragically did not survive a delivery by emergency caesarean section—thereafter mistakenly served the defendant physician with a second report authored by the same expert but critiquing care provided to a different patient by a different doctor. *See id.* at 38–39. In response to the defendant physician's argument that *Zanchi* required her formal naming in an existing lawsuit as a predicate to service of a report, the court observed that "we did not mandate that physicians or health[ ]care providers on the receiving end of a health[ ]care liability claim *must* be a 'party' to a lawsuit *before* they could be properly served with an expert report." *Id.* at 42 (emphasis in original). Indeed, the court noted

11

that "the statute does not say that the party must be a party at the time the report is served, and none of the statute's other provisions expressly or implicitly prohibit service before the defendant is named as a party to the suit." *Id.* Accordingly, the court held that service of the expert report concurrently with pre-suit notice complied with Section 74.351(a). *Id.* at 43; *see also Ransom v. Eaton*, 503 S.W.3d 411, 411–12 (Tex. 2016) (holding expert report properly served on "party" concurrently with pre-suit notice).

Although the supreme court has not yet interpreted the meaning of the phrase "the party's attorney" in Section 74.351(a), *Zanchi*, *Hebner*, and *Ransom* strongly suggest that the referenced attorney need not make a formal appearance on behalf of a named defendant in an existing lawsuit before he becomes eligible to accept service of an expert report. *See Villarreal v. Fowler*, 526 S.W.3d 633, 634–35 & n.1 (Tex. App.—Fort Worth 2017, no pet.) (observing that, given email service of expert report on her attorney two weeks before the filing of suit, defendant licensed professional counselor "understandably asserted no argument challenging the pre-suit service").

The question presented by this appeal, therefore, is whether the evidentiary record supports the trial court's implicit conclusion that Hurst was the attorney for Appellants when he accepted service of the expert report concurrently with Arens's original petition naming Living as the sole health care liability defendant. Absent the filing of findings of fact and conclusions of law, *see Rinkle*, 658 S.W.3d at 824, we conclude that it does.

## C. Analysis

Appellants argue the failure of Arens to serve an expert report on them concurrently with or after filing her first amended petition should decide the question decisively in their favor, particularly since Hurst never formally appeared on their behalf until he signed and filed their original answer and had previously appeared in the first and second lawsuits solely on behalf of Living. Relying on the supreme court's clarification of *Zanchi* in *Hebner*, Arens counters that she served Appellants when she served the report on Hurst concurrently with her original petition and that Hurst accepted service as the attorney for "Martin Crest" and later confirmed his authority to do so by filing an original answer for Appellants. Appellants respond that *Hebner* is factually distinguishable because, unlike Arens, the claimant parents served the defendant physician—not her attorney—with the expert report before filing suit against her. Unfortunately, neither Arens nor Appellants support their arguments with any post-*Zanchi* authority describing under what circumstances an attorney is considered "the party's attorney" for purposes of pre-suit service of an expert report, particularly when representing multiple health care liability defendants, actual or eventual.[5]

---

[5]Appellants cite *Matthews v. Lenoir* as post-*Zanchi* authority suggesting a "party's attorney" becomes so only after a formal appearance. 439 S.W.3d 489, 495–97 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (holding timely service of expert report on attorney general after formal appearance on behalf of defendant state employer, but before formal appearance on behalf of defendant nurse employee, did not satisfy Section 74.351(a)). But *Matthews* turned on the unique statutory requirements for

13

Ironically, the supreme court's disapproval of our reasoning in *Dingler v. Tucker* provides helpful guidance.[6] 301 S.W.3d 761, 766–68 (Tex. App.—Fort Worth 2009, pets. denied), *abrogated by Zanchi*, 408 S.W.3d at 377–79. By incorrectly foreclosing the possibility of "party" status under Section 74.351(a) absent service of process upon a

triggering attorney general representation of a defendant state employee. *See id.* at 496–97 (citing Tex. Civ. Prac. & Rem. Code Ann. § 104.005). "A state employee is not served through service on the state attorney general[, however]; service on the attorney general is simply a mechanism necessary to ensure that the state is liable for the conduct of its employees." *Id.* at 497 (citing *Hamilton v. Pechacek*, No. 02-12-00383-CV, 2014 WL 1096018, at *2 (Tex. App.—Fort Worth Mar. 20, 2014, no pet.) (mem. op.)). Because Section 104.005 "does not designate the attorney general as an agent for service of process for public servants" and service of process on the defendant nurse employee did not trigger attorney general representation until *after* the deadline for serving an expert report had already passed, as a matter of law, the attorney general was not a "party's attorney" upon whom service of the expert report satisfied Section 74.351(a) as to the defendant nurse employee. *See id.* at 496–97.

The other post-*Zanchi* case cited by Appellants is also distinguishable. *See Univ. of Tex. Health Sci. Ctr. at Houston v. Joplin*, 525 S.W.3d 772 (Tex. App.—Houston [14th Dist.] 2017, pet. denied). In *Joplin*, the claimants served their expert report on the defendant physician, who then forwarded the report to her former government employer, the health center, requesting defense and representation. *Id.* at 775. The claimants subsequently amended their petition and substituted the health center for the physician as a defendant but never served their expert report on the health center *or its attorney*, the attorney general. *Id.* The *Joplin* court rejected the argument that service may be satisfied when one defendant (physician employee) *provides a copy* of the expert report to another defendant (government employer). *Id.* at 781 (citing Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a)). But this case contemplates pre-suit service of the report by the claimant herself on a defendant "party's attorney." Moreover, Appellants are not governmental units represented by the attorney general, like the health center in *Joplin*, and this is not a case involving employee–employer defendants.

[6]The supreme court's disapproval of the very argument urged by this author during his representation of Dr. Dingler before this court renders that "victory" retrospectively *Pyrrhic* in nature, particularly given the necessity of documenting the error in this opinion. *See Dingler*, 301 S.W.3d at 766–68.

named health care liability defendant, this court avoided the question presented by pre-suit legal representation of multiple defendants. Consideration of the factual circumstances of *Dingler* in light of *Zanchi* and *Hebner* supports the trial court's ruling in this case.

### 1. *Dingler v. Tucker*

In *Dingler*, the Tuckers filed their original petition on November 5, 2007, alleging health care liability claims against Dr. Dingler and Nocona Medical Clinic. 301 S.W.3d at 763. They served Nocona with citation by certified mail the following day. *Id.* Nocona subsequently filed its original answer on November 26, 2007, signed by its attorney of record. *Id.* at 764. That same day, the Tuckers served Nocona's counsel—having formally appeared on behalf of Nocona—with their expert report in compliance with Section 74.351(a). *Id.*

Nocona subsequently challenged the sufficiency of the expert report, both as to its direct liability alleged therein and as to any vicarious liability asserted due to the negligence of Dr. Dingler. *See id.* "On June 6, 2008, Nocona filed a motion to dismiss the Tuckers' claims." *Id.* Significantly, three of Nocona's filings in this time frame—its original answer, its objections to the expert report, and its special exceptions to the Tuckers' original petition—listed its attorneys with the designation "Attorneys for Defendant Dingler" or "Attorneys for Defendant Len Dingler, M.D." in their signature blocks. *Id.* at 766 n.2.

Then, "approximately seven months after the Tuckers filed the lawsuit, they served Dr. Dingler with citation by personal service." *Id.* at 764. Dr. Dingler subsequently filed his original answer with another attorney—from the same firm as counsel for Nocona—formally appearing as his attorney of record by signing the pleading on his behalf. *Id.* "The Tuckers never personally served Dr. Dingler with [the expert] report—either before or after service of citation." *Id.* He thereafter filed a motion to dismiss "on the ground that the Tuckers had failed to comply with [Section] 74.351(a) by failing to serve either him *or his attorneys* with an expert report within 120 days after the date the original petition was filed."[7] *Id.* (emphasis added). The trial court ultimately sustained Nocona's objections to the report and granted its motion to dismiss, but it denied Dr. Dingler's motion to dismiss, prompting the appeal. *Id.* at 764.

On appeal, Dr. Dingler argued that the Tuckers failed to comply with Section 74.351(a) because

> (1) he was not served with the report at any time between the filing of the original petition and the filing of his motion to dismiss and (2) the Tuckers' service of [the expert] report upon counsel for Nocona in November 2007 constituted service on behalf of only Nocona, not him too, because—even though he share[d] attorneys with Nocona—at that

---

[7]Counting February 29 for the leap year 2008, the Tuckers served Dr. Dingler with citation 219 days after filing their original petition—well beyond the 120-day deadline for serving their expert report. *See id.* at 763–64, 766–67. During that time frame, they had attempted personal service of citation through certified mail, "but the citation, which issued November 5, 2007, was returned unclaimed after the post office made several attempts to serve it." *Id.* at 763–64.

point in time, he had not been served with citation nor had he made an appearance in the case.

*Id.* at 766. A majority of this court agreed, interpreting the term "party" to require service of citation upon a defendant named in an existing health care liability lawsuit, thereby foreclosing service of an expert report upon that "party's attorney" absent such service of citation. *See id.* at 766–67. Accordingly, the majority expressly rejected the Tuckers' argument that service of the report upon Nocona's counsel should be imputed to Dr. Dingler since they subsequently appeared on his behalf. *See id.*

The majority further rejected the Tuckers' equitable argument that the court should impute timely service of the expert report due to Dr. Dingler's conscious decision not to claim certified mail from the clerk of the court, noting the Tuckers' failure to present any evidence of *improper* avoidance of service or to cite any authority by which we could do so, even if we so found such gamesmanship. *Id.* at 767–68. Finally, the majority implicitly dismissed as a basis for imputation the signing of Nocona's pleadings on behalf of Dr. Dingler by Nocona's attorney because the substance of the pleadings unequivocally demonstrated advocacy on behalf of Nocona, not Dr. Dingler. *See id.* at 766 n.2. Finding an abuse of discretion in the trial court's refusal to grant Dr. Dingler's motion to dismiss, the majority reversed the trial court's ruling and remanded with instructions to enter an order of dismissal with prejudice including an award of reasonable attorney's fees. *See id.* at 768, 771.

Dissenting from the majority's decision in favor of Dr. Dingler, Justice Terrie Livingston found persuasive the Tuckers' argument imputing service of the expert report upon Nocona's attorney to Dr. Dingler:

> I believe that once Dr. Dingler became a party to the suit—when he was served with citation—he was served with the expert report that same day because the attorneys who actually represent him in this litigation had already been served with the report on behalf of Nocona. While Dr. Dingler was not an actual "party" to the suit until June 11, 2008, when he was finally served with citation, the service of the expert report on Nocona's and Dr. Dingler's mutual attorneys, which had occurred previously, ripened as to Dr. Dingler on the day he became a party. In other words, as to Dr. Dingler, it was a prematurely served report, but once service on Dr. Dingler was perfected, so too was service of the expert report.

*Id.* at 771–72 (Livingston, J., concurring and dissenting) (footnotes omitted). Further observing that the majority's interpretation of Section 74.351(a) impaired the ability of health care liability claimants to comply as to defendants subject to delayed service of citation and otherwise encouraged avoidance of such service until expiration of the 120-day deadline, Justice Livingston concluded that "the duty to serve the report cannot begin to run until the particular defendant has been made a party" and that "Dr. Dingler's counsel was timely served with the expert report." *Id.* at 772.[8]

---

[8]Because we unanimously sustained the Tuckers' cross-appeal complaining of the trial court's dismissal of their vicarious liability claims against Nocona, they were ultimately able to prosecute their allegations of negligence against Dr. Dingler through Nocona. *See id.* at 771.

18

## 2. *St. Luke's Episcopal Hospital v. Poland*

Another pre-*Zanchi* dissenting opinion, the reasoning of which we find equally persuasive, is that of Justice Terry Jennings in *St. Luke's Episcopal Hospital v. Poland*, wherein he and Justice Jane Bland rejected the majority's ruling that an expert report could be served on a party's attorney only after the filing of a lawsuit. 288 S.W.3d 38, 49–55 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (op. on reh'g) (Jennings, J., dissenting from denial of en banc reconsideration). The dissent interpreted former Section 74.351(a) to contemplate pre-suit service of an expert report upon a party's attorney when counsel for the defendant health care providers responded to the claimants' properly served pre-suit notice of claim by identifying themselves as counsel for the health care providers and inviting settlement negotiations and counsel for the claimants faxed a copy of an expert report to them in furtherance of such negotiations. *See id.*

Indeed, Justice Jennings's dissent, joined by Justice Bland, anticipated *Hebner* in concluding that "[n]othing in former [S]ection 74.351(a) precludes a claimant from serving an implicated physician or health care provider with her expert report . . . along with an original petition or prior to the actual filing of such a claim in court," so "service of the expert report directly upon counsel for [the health care providers] was more than adequate." *See id.* at 53. The *St. Luke's* dissent would have held that the trial court did not abuse its discretion in concluding the same. *See id.* at 53, 54 ("Setting aside the trial court's express finding that the [claimants] had timely served their

expert report on the [health care providers'] attorneys . . . under these circumstances constitutes a misapplication of the former Section 74.351(a).'").

### 3. Abrogation of *Dingler* and *St. Luke's*

Given the *Zanchi* court's abrogation of the majority's interpretation of Section 74.351(a) in *Dingler* and *St. Luke's*, the *Dingler* and *St. Luke's* dissents provide persuasive authority contemplating service of an expert report on a party's attorney *before* the attorney makes a formal appearance on its behalf, even after the attorney has appeared formally on behalf of another related defendant. Nevertheless, neither *Zanchi* nor its progeny embraced the retrospective imputation of service the *Dingler* dissent suggests; instead, the evidentiary record must demonstrate the existence of an attorney–client relationship between the party and the attorney concerning the very health care liability claim made the subject of the expert report. *See Ransom*, 503 S.W.3d at 411–12; *Hebner*, 498 S.W.3d at 41–43; *Zanchi*, 408 S.W.3d at 377–79; *see also St. Luke's*, 288 S.W.3d at 53 (Jennings, J., dissenting from denial of en banc reconsideration).

For example, in *Dingler*, counsel for Nocona signed Nocona's original answer identifying himself and his firm as counsel of record for both Nocona and Dr. Dingler. The Tuckers thereafter served their expert report (which imputed Dr. Dingler's medical negligence to Nocona vicariously) on said counsel in support of their health care liability claims against both. The trial court could have reasonably inferred from that exchange that counsel for Nocona and counsel's firm were

20

Dr. Dingler's attorneys for purposes of Section 74.351(a) service, despite the undisputed fact that Dr. Dingler had yet to be served with citation. The trial court's inference could have been confirmed by (1) the two subsequent pleadings with signature blocks referencing the firm's representation of Dr. Dingler as a defendant in the lawsuit and (2) the firm's eventual formal appearance on his behalf. *See Dingler*, 301 S.W.3d at 766 n.2. By way of contrast, given that none of the three pleadings substantively advocated for any party other than Nocona, the trial court would not have abused its discretion by declining to find a sufficient attorney–client relationship at the time of the Tuckers' service of the report on counsel for Nocona. *See id.* ("The substance of the filings demonstrate that they are made on behalf of only Nocona.").

**4. The Evidentiary Record in the Current Lawsuit**

Appellants categorically deny that Hurst was their attorney for service of an expert report until, at the earliest, he obtained their permission to accept service of process on their behalf and emailed counsel for Arens to that effect. During the hearing on Appellants' motion to dismiss, Hurst testified:

> My name is Michael L. Hurst; I'm an attorney in Dallas, Texas[,] with the law firm of Thompson, Coe, Cousins, and Irons. I was retained to represent Capital Senior Living, Inc. in a lawsuit brought by Ms. Arens.
>
> In that capacity, I filed an original answer for that defendant. At the time that the original petition was filed against Capital Senior Living, Inc., an expert report was served on me as counsel of Capital Senior Living, Inc. on or about August 17[], 2021.

21

Capital Senior Living, Inc.'s original answer was filed 09/20/2021. In that answer, it was asserted that Capital Senior Living, Inc. was not a proper party to the action.

Subsequent to the answer being filed for Capital Senior Living, Inc., the plaintiff chose to sue Capital -- CSL Weatherford, LLC and Capital Senior Management S, Inc.

Subsequent to the filing of that petition, I was retained to represent these two defendants. The original answer was filed on January 31[], 2022. From the time that the First Amended Petition was filed, on January 4, 2022, until May 31[], 2022, no expert report was served upon me as counsel for CSL Weatherford, LLC or on me as counsel for Capital Senior Management S, Inc. I have never received any type of expert report during the time period that I represented these two new defendants.

On cross, Hurst denied that he represented Martin Crest Assisted Living or knew who did business as Martin Crest Assisted Living. More specifically, when asked which of the two legal entities he represented "does business" as Martin Crest Assisted Living—Weatherford or Management—Hurst dissembled: "I'm not prepared to tell you that under oath, I'm sorry. I don't know if it's them, Capital Senior Living, Inc., or somebody else. I don't know."

Finally, when confronted with the email from counsel for Arens inquiring whether he would accept service on "Martin Crest" and his affirmative response thereto, Hurst testified: "I don't know. I'm not denying it; I just don't know the e-mail." Asked the same question a second time, Hurst again denied familiarity with the email exchange: "I don't know what the e-mail says, but if you just want to put it into evidence. But I don't know what the e-mail says."

Hurst's testimony is not supported by the evidentiary record. Significantly, Hurst himself introduced the documentary evidence that contradicted critical portions of his sworn testimony, including Living's original answer and its initial disclosures.[9] Moreover, by identifying Appellants and Martin Crest employees as persons with knowledge of the health care liability claims asserted by Arens and instructing that they be contacted not by their individual or business addresses and telephone numbers but strictly "c/o Michael L. Hurst [of] Thompson, Coe, Cousins & Irons," Hurst formally confirmed his authority to accept correspondence and

---

[9]Hurst testified to not knowing which, if any, of the three entities he represented did business as Martin Crest Assisted Living: Living, Weatherford, or Management. On the contrary, Hurst introduced for the trial court's consideration the original answer he signed and filed on behalf of Living, which specifically denied "that it does business as Martin Crest Assisted Living." *See W.C. Turnbow Petroleum Co. v. Fulton*, 194 S.W.2d 256, 257 (Tex. 1946) ("Counsel should sign their names to motions and pleadings 'to make themselves responsible for what is stated in them, and so as to leave no doubt as to the parties for whom they appear.'" (quoting *Simmons v. Fisher*, 46 Tex. 126, 129 (1876))); *In re Valliance Bank*, 422 S.W.3d 722, 726 (Tex. App.—Fort Worth 2012, orig. proceeding [mand. denied]) (en banc op. on reh'g) ("An attorney's signature on a pleading certifies that he has read the document and that to the best of his knowledge, information, and belief, *formed after reasonable inquiry*, the instrument is not groundless and not brought in bad faith or for the purpose of harassment." (emphasis added) (citing Tex. R. Civ. P. 13)).

Hurst also introduced Living's initial disclosures wherein, by his signature, he specifically identified Weatherford and Management as the owner and manager, respectively, of "Martin Crest." *See* Tex. R. Civ. P. 191.3(b) ("The signature of an attorney or party on a disclosure constitutes a certification that to the best of the signer's knowledge, information, and belief, *formed after a reasonable inquiry*, the disclosure is complete and correct as of the time it is made." (emphasis added)); *In re Allied Chem. Corp.*, 227 S.W.3d 652, 657 (Tex. 2007) (orig. proceeding) (observing that parties and the attorneys who sign discovery responses on their behalf certify that a response is complete "based on all information reasonably available to the responding party or its attorney at the time the response is made").

23

communications on behalf of Appellants *as their attorney* the very same day and contemporaneously with his making a formal appearance on behalf of Living. *See Regalado v. State*, 934 S.W.2d 852, 854 (Tex. App.—Corpus Christi–Edinburg 1996, no writ) (affirming default judgment in a bond forfeiture proceeding and concluding that the only fair and reasonable construction of the return of citation identifying "Name: c/o Maria Regalado" as the recipient indicated "that the executing officer left the citation *in the care of* Maria Regalado; that is, in Maria Regalado's own hands" (emphasis in original)); *see also W. Union Tel. Co. v. Young*, 13 S.W. 985, 985 (Tex. 1890) ("The direction to 'Mrs. N. Young, care of W.R. Henry & Co.,' has the same meaning and legal effect as it would have had if the direction had been 'to W.R. Henry & Co., for Mrs. Young.'"); *In re Panek-Hortman*, 593 B.R 400, 402 (Bankr. W.D.N.Y. 2018) (observing letters "c/o" are "a common abbreviation that stands for the words 'in care of'" typically used "to identify a third party to whom mail is being sent on behalf of the intended recipient").

In other words, the evidentiary record considered by the trial court supported a reasonable inference that Hurst was the "party's attorney" for Living, Weatherford, and Management not only at the time of his formal appearance on behalf of Living but also at the time he agreed to and did accept service of both the original petition and the expert report on behalf of "Martin Crest." This inference is supported by both Hurst's apparent pre-suit participation in the production of records from Martin

24

Crest[10] and by his formal appearance on behalf of Living, Weatherford, and Management in defense of the health care liability claims brought by Arens. And the subsequent email exchange between counsel for Arens and Hurst confirming Hurst's authority to accept service of citation on behalf of Appellants did not conclusively contradict the reasonable inference that he was the "party's attorney" for Appellants at the time he accepted service on behalf of "Martin Crest," given the more restrictive process due for formally appearing. *See supra* note 2 (observing that effective service of citation upon a named defendant's attorney requires the filing of a verified written memorandum).

Accordingly, deferring as we must to the trial court's implicit finding that Hurst was the attorney for Appellants when counsel for Arens served him with the expert report by email on August 25, 2022, we conclude the trial court did not abuse its discretion in denying the motion to dismiss. *See United Healthcare of Tex., Inc. v. Low-T Physicians Serv., P.L.L.C.*, 660 S.W.3d 545, 552 (Tex. App.—Fort Worth 2023, no pet.) (observing the trial court "is the sole judge of the witnesses' credibility and the weight to be given their testimony" when acting as the factfinder).

---

[10]As noted above, Hurst reasonably suggested his participation in a pre-suit document exchange on behalf of a separate "potential Defendant" identified in the initial disclosures—well before making a formal appearance on behalf of Living or Appellants—particularly when he identified Weatherford and Management "c/o Michael L. Hurst.

### III. Conclusion

Having overruled Appellants' sole issue on appeal, we affirm the trial court's order denying Appellants' motion to dismiss in its entirety.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: April 6, 2023